Livingston

on a motion for a rehearing. The two points, decided by the court and presented *140 as the basis of their judgment, were not much discussed on the hearing and are of such vital importance to the country, that it is, confidently hoped they will be submitted to a closer examination, with the new lights that subsequent research may throw on the subject.
1. The first of these points is, that an act of the legislature of the late territory, taking private property for public use, without compensation, is valid and is not contrary to the ordinance nor the constitution of the United States.
2. That the soil as well as the use of the highway, in this state, belongs to the public.
I. The origin, object and avowed end of every government, is the preservation of the persons of its people and their property from violence. Without any express constitutional provision, therefore, every act that counteracts these objects must be unlawful. A partial surrender of personal liberty and of private property is, however, necessary to secure the residue, but the right to abridge either is only commensurate with necessity. Where this does not exist, the encroachment either on liberty or property is tyrannical: for example, the property of any citizen may be occupied in time of war, when necessary for public defence, and his personal *141 services may be required for the same cause, and that, without any previous compensation, because the exigency of the moment will not permit the delay necessary for selling and paying it. But in time of peace, when private property is required only as convenient for the public, it can never be justly taken without the owner’s consent. When necessary, as in the case of public highways, it may be taken without such consent, but not without compensation; because, though a necessity may exist for the road, there can be no such necessity for denying compensation, previous if possible, but at any rate compensation; the social compact admitting of no temporary infringement of private right, farther than is absolutely necessary for its permanent preservation; the supreme power of a state cannot, therefore, destroy those rights it was stipulated to preserve.—It is true that in ill-organised governments, where the judicial power is blended with, or dependent on, the legislative, there is no remedy for acts contravening these principles: but if a state have a judiciary independent of legislative power, it would be the duty of such a judiciary to declare a law void which should direct private property unnecessarily and without compensation, to be taken for public use and that too, whether there was a writ *142 ten constitution or not: because no written constitution can have greater force than those immutable principles on which all political society is founded.
If our constitution therefore, contained no other feature than the separation of the judicial from the law-making power, it would be the duty of the former to keep the latter within its proper bounds, by declaring every act of unnecessary violation of private rights, to be void.—I acknowledge that in such a case, the violation must be open and apparent, to justify the interference: because the legislative may be better judges of the existence of the necessity than the judiciary; but, the difficulty of discriminating in doubtful cases can be no objection to the exercise of power under circumstances where no such doubt exists.
Thus the case would stand, if tested by the dictates of natural law: let us now examine the constitutional provision.
The law laying out this road, or rather only directing it to be laid out, passed in the year 1809, this country was then governed by the ordinance of 1787, as its constitution, with such changes and amendments as the present constitution of the United States, and the laws under it had produced.
*143 This ordinance contains several articles of compact, between the original states and the people of the territory, which were to remain forever unalterable except by common consent. These articles generally go to secure the inhabitants in the enjoyment of their civil and political rights. Among them, we find the memorable provision that has been handed down to us unaltered for six centuries, and has been transferred by the descendants of Englishmen from Runnymede to the banks of the Mississippi; from the great charter of England to all the constitutions of her former colonies, the United States; “that no man shall be deprived of his liberties or property, but by the judgment of his peers or the law of the land.” I need not inform this honourable court that these are technical as well as sacred words, and that the “Law of the Land” as used in these instruments does not mean the acts of ordinary legislation, because the provision would rather sanction than forbid acts of legislative oppression, but that it means a course of judicial proceeding according to the established forms of law. Immediately after this important clause (relating to the exceptions which might be created by public necessity) the compact goes on to provide for that case also, by declaring “that in case the public exigencies should *144 make it necessary for the common preservation to take any person’s property, or to demand his particular services, full compensation should be made for the same.” Here then is every case specially provided for, according to the principles of natural law, which have been already laid down—You shall take no man’s property unless it be forfeited according to law, except in case of urgent necessity, and then only on making compensation. Surely nothing can be more apparent than the bounds which are here set to the legislative power, to remove them in the slightest degree, to admit by a judicial decision that the legislature may take private property for public use or convenience, would surely be subversive not only of the constitutional compact, but of the great principles which it was meant to sanction and enforce. To suppose that the words for the “common preservation,” which are used in this clause, meant to limit the obligation to compensation strictly to cases, in which there was an urgent necessity for taking the property or services, would, I most respectfully suggest, by saying that the ordinance intended to force the legislature to make compensation when they were justified by necessity in taking; but to leave them at liberty to compensate or not, where there was no necessity—that when they took my *145 property, because it was essential to the safety of the state, they should pay me its value, but when they chose to take it to suit their convenience, to indulge their caprice, to gratify their rapacity, they are under no such obligation. This would surely be a woeful sacrifice of the spirit of the constitution, to a very narrow construction of its letter, and that too in a point where of all others it ought to receive the most liberal interpretation, for the protection of liberty and property.
The 7th article of the amendments to the constitution of the United States, which provides, “that private property shall not be taken for public use, without just compensation”, is supposed not to apply to the present case, because it could only mean property “taken for the United States, or in pursuance of some power derived from the constitution of the United States.”—admitting this construction, which is probably the true one, the case in question comes within it. The legislature of the territory of Orleans, derived all its authority from the United States. The governor and one branch of the legislature were appointed by the president: all laws were subject to the revision of congress and the whole government, if we except one branch of the legislature, exhibited the perfect *146 model of a subordinate body, under the complete control of congress. If the amendment, therefore, was intended to apply to powers “derived from the constitution of the United States,” this case comes within it: nor, will it be any answer to this argument to say, that the ordinance of 1787 was made by the congress under the confederation, because, by the 4th article thereof, it is declared that the territories “shall remain a part of the confederation, subject to the articles of confederation and to such alterations therein as shall be constitutionally made: and in point of fact the territory of Orleans was attached to the Union, under the constitution, by virtue of the ordinance passed by the congress under the confederation.
Therefore the principles of natural law, the provisions of the ordinance, and the constitution of the United States, all equally forbid the taking of private property for public use, without compensation. If then the laws of the territory purport to deprive the plaintiff of his property without compensation, they must be unconstitutional and void: if they do not deprive him of it then it is his still, and he ought to recover. I agree perfectly to the maxims laid down by the court, that the unconstitutionality of an act, must be clear and apparent before they can declare it *147 void. This is in fact, saying no more than that they must be convinced that it is unconstitutional: No matter how that conviction is produced, whether it flashes on the mind intuitively on the first view of the law, or whether it is the result of patient investigation and long research, the moment that conclusion is formed by the understanding, then duty points out the path to the judge; while he doubts, it is certain he cannot decide, and no case can conscientiously he determined, until all doubts on the one side or the other are removed.
The quotation from the civil code was made, not to rely on it as a constitutional provision, but to enforce the principle of natural law, that has been referred to, by the authority of the legislature, and also as a law, which enforced the constitutional provision, by declaring that the compensation which it provided shall be made previous to the taking the property. On the time of making compensation the ordinance was silent, the law, therefore, had a right to supply the defect; and though a subsequent legislature might unquestionably have repealed this general provision, yet, undoubtedly, until it be expressly repealed, every particular case must be governed by it, unless the will of the legislature *148 be specially declared that it shall not. For instance, if, in the case before the court, the legislature in appropriating the individual's property to the public use, had declared that it should be paid for a year after it was laid open, it might be forcibly inferred that the legislature intended to repeal in this instance the general provisions of the code—or, again if there were no constitutional objections and the legislature had declared in the law, that the property should be taken without compensation whatever, then the same inference might be drawn: but as there is nothing like either of these provisions, it may fairly be concluded that those contained in the code on this subject were not intended to be dispensed with. “Leges posteriores priores contrarias abrogant." This is undoubtedly true as a general rule; but, Blackstone tells us “this “is to be understood only when the latter statute is couched in negative terms, or where its “matter is so clearly repugnant that it necessarily implies a negative;" of which he gives several examples, 1 Black. 89. It is an established rule that all statutes in pari materiâ are to be taken together as if they were one law, Dougl. 30; and it is also held that if any thing contained in a subsequent statute be within the reason of a former statute it shall be taken to be *149 within the meaning of that statute. Ld. Raym. 1018, 4 Rep. 4, Vernon’s case. Now apply these principles to the case. The first act declares (Code) that no private property shall be taken for public use, without a previous payment of its value; the subsequent act declares that the property shall be appropriated to public use, without saying any thing of the payment. Does this repeal the provision in the first act which requires previous payment? I think not:
1. Because there are no negative words.
2. Because the two statutes, being in pari materiâ and compatible with each other, must be taken together.
3. Because the latter case is completely in the reason and equity of the first: and
4. Because a statute shall not without express words be so construed as to carry with it consequences manifestly contrary to natural law. 1 Black. Com. 91.
Therefore, I conclude that if there were no constitutional bars, the two acts of the legislature (the code and the statute) must be taken together, and that the property could not vest in the public, without previous compensation to the owner. This last branch of my argument will be strengthened by the observation made by the court, but which had escaped me, that it was the *150 same legislature which passed the code, that at the next session enacted the statute: and they could not respectfully be supposed so soon to have forgotten their own principles. A perusal of the several statutes on the subject will, I think, shew that none of them purport to deprive the party of his property.
The first law passed on the subject of the premises in question is of the 7th June, 1806. It gives to the inhabitants of the county of Attakapas, the exclusive right to make improvement to the canal. It directs a judge and jury to determine what improvements are necessary, and to fix a toll to be paid in proportion to the size of the boats. This law is silent as to the road, or even the banks of the canal, but it clearly shews it to be the work of industry, not a natural water course, and that therefore, neither the soil it covered, nor the banks which contained it could be public either as to use or property.
The second law passed 11th March, 1809; its first section takes away the toll that had been granted or rather suspends the right of exacting it, until the canal shall be finished.
But the second section declares that the borders of the said canal shall be “considered as public highways,” and directs that the proprietors of land lying on its borders shall be com *151 pelled to keep it in repair according to the provisions of the existing laws and regulations.—No width is assigned to the roads thus created on the borders of the canal; it is left to the existing laws and regulations, and was fixed as appears by the statement of facts, on the 24th July, 1811, at twelve feet on each side.
The third act is passed the 2d April, 1811, entitled “an act to open and improve certain roads.” On the subject of the road in question it appropriates 500 dollars to improve the road of the canal of La Fourche to lake Verret. And the judge of the parish and two other persons are appointed commissioners “to superintend the works of the said road.” As to other roads mentioned in this act, such as
1. From Concordia to Alexandria.
2. From the mouth of Red river to Avoyelles.
3. From Baton-Rouge to Opeloussas.
4. Across the point of Plaquemine.
5. From Plaquemine to point La Hache.
In all these cases the appropriation is to open and establish a road. While in this case, and in that of the road across Manchae point, it is for the purpose solely of “IMPROVING” the road already existing.
The second section directs the commissioners to cause the roads “to be traced out and open *152 ed, and to report to the legislature the progress they shall have made.”
These are all the laws on the subject in question: under the last act, the commissioners laid out a road of sixty-two feet wide on each side of the canal, comprehending every foot of arable land in the plaintiff’s tract. Whether pursuant to the directions of the act, they made report to the legislature does not appear, and therefore cannot be presumed, but most certain it is, that the legislature did never pass any act approving what the commissioners had done.
Let us now review these acts with the view of discovering whether any of these evince a legislator’s will, that the owner shall be deprived of the property in question.
The first (7th June, 1806) only disposes of the canal, so far as to give to certain persons the right of taking a toll: but it certainly excludes the idea of the canal, being a public watercourse, and of course of its banks being subject to a public servitude or right of way.
The second (11th March, 1809) suspends the right of toll; until the canal shall be rendered navigable, and declares, that its borders shall be considered as a highway, which the neighbouring proprietors shall keep in repair: the police jury fix the extent of this public high *153 way to twelve feet. As far then, as the legislative will is shewn, it is only the borders of the canal, which I suppose means its banks, that are at all converted into a highway. And let it be observed that they do not refer to the “existing laws and regulations” for the extent which the paths are to have, but to the keeping them in repair, which it is declared must be “according to the provisions of such laws and regulations.” Under this act then, it may well be doubted whether the police jury had a right to extend the width of the road to twelve feet. But what is clear, is that on no construction can it under this law be extended further.
The third act is the one most relied on, but there is not a syllable in it that either looks like a design in the legislature to deprive the plaintiff of his property, or to authorise the commissioners to enlarge the road; its phraseology is particular: In the places where a new road was to be laid out, as in the five instances cited, the appropriation is to open and establish a road—In the two cases, one of which is ours, where it already existed, it is to “improve” only. By what process of reasoning an appropriation of $500, to improve a road of twelve feet wide, can be changed into an act for taking away from the proprietor all the rest of his estate, I am at a loss to con *154 ceive. Even as to the other cases, mentioned in the act, where new roads were to be erected, nothing final is determined; the commissioners are to trace out the roads and then report to the legislature—For what purpose? Plainly that the legislature might act justly and constitutionally, that they might make further appropriations, if any were necessary, to indemnify the individual whose property was used—no such report was made, no further act was passed, therefore, even if the legislature intended to take the property (of which there is not the slightest evidence) the act is yet inchoate, and the individuals still enjoy their rights, admitting the legal power of the legislature to deprive them of it.
The use, that was made of this road twenty-five years ago by the inhabitants of the Attakapas, has been also relied on: but, surely no lawyer will say that such use took away the right of soil: at most, if it be a presumptive title at all, it is only a title to a servitude of way, and such a title is not at all incompatible with our action.—As little can the acquiescence of the parties be objected to shew as an argument that they were not “compelled” to part with their property; because they never did acquiesce. On the contrary, the plaintiffs leased the premises in question four years ago, and received rent for them all *155 that time, recovered it by suit as one of the judges may recollect, during the continuance of the lease, and as soon as the lease expired brought the present suit.
II. The second point to be considered is whether, supposing the premises to be situated in a highway legally laid out, the owner of the soil, through which it is laid out, cannot maintain this suit—in other words, whether the state owns the soil or only the use of the highway in this state?
This is a most interesting question for every proprietor in this state: should it be determined in the way the court at present incline to decide it, the most vexatious and oppressive consequences would follow.
The Roman law has been cited by the defendant, and seems to have had some influence with the court in deciding this question. Before we enter into the investigation, it may be proper to remark that the consular or pretorian or public highways of ancient Rome were constructed with such solidity as to remain, after the lapse of 2000 years, monuments which attest the grandeur of those masters of the world, and at an expence to which the feeble efforts of modern times on this subject bear no comparison. Such fabrications would naturally be placed on lands previously *156 secured to the public by purchase or conquest, and when the Roman laws define a public way to be “that of which the soil is public,” they mean no more than to say that all their public ways were constructed on public ground; but, surely this cannot lead us to the conclusion that a way made on private ground becomes ex vi termini public property, both as to soil and the use.
Let us now examine the law; the text relied on is D. 53, 8, 3, sect. 24, viam publicam eam dicimus cujus etiam solum publicum est, et non enim sicuti in privata via, ita est in publica accipimus, viæ privatæ solum alienum est; jus tantum eundi et agendi nobis competit. Viæ autum publicæ solum publicum est.” Here the quotation ends, but the text proceeds in the same sentence to say “relictum ad directum certis finibus latitudinis ab eo qui jus publicandi habuit, ut ea publicè iretur commearetur.” This latter member of the sentence is important, not only because the sense is incomplete without it, but because it shews, what I contend for, that in constituting a public way at Rome, the property of the soil was transferred to the public by him who had the right: “ab eo qui jus publicandi habuit.”
We accordingly find that when a public highway was carried away by a flood, the neighbouring land might be appropriated for this pur *157 pose, but only when paid for by the public.—“Cum via publica, vel fluminis in pet vel ruinâ, amissa est, vicinus proximus viam prestare debet." D. 8, 6, § 14, and Godfrey in his note on the passage says, sed impensâ publicâ. This is more expressly laid down in the following authority, "Via vicinalis dicitur publica quando solum viæ vicinalis emitur a publico.” Dayoz Ind. juris civil, verbo via.
These authorities shew that among the Romans, that was a public road, of which the soil was bought by the public and which was made at their expence: the following shews the converse of the proposition, that all roads laid out over private property, and made and repaired at the expence of individuals are private roads, by whatever name they may be called, that is to say, that the soil is private property though the use be public.” "Viae vicinales, quœ ex agris privatorum collatis facta sunt, quarum memoria non extat, viarum publicarum numero sunt; sed si extat, memoria quod sint factæ ex collatione vicinorum, sunt viæ vicinales privatae. Dayoz ut supra. This is a striking authority, to shew the nature of the Roman public ways: if a road should have been made over private property, but it has continued so long that there is no memory of the fact, then *158 it shall be deemed public. But if there is any remembrance of the time at which it was laid out, by the contribution of individuals, it is not then a public, but a vicinal way and the soil of course private property.
The same doctrine is most distinctly, more strongly laid down in the two articles immediately following in the same book.
The present law contains the same distinction. 5 Pand. Franc. 108, speaking of roads says, “Touts ceux qui sont entretenus par le tresor public font partie du domaine. Les autres appartiennent á ceux qui sont chargés de les entretenir.”
From a book of great authority and an adjudged case, which it cites, we have the point as far as depends on the French laws fully decided. 5 Repertoire jurisprudence, p. 367. title Chemin, says, Lors qu’un chemin a ete abandonné et qu’il n’est plus d’aucun usage, le seigneur haut justicier (the lord of the manor) peut en disposer dans sa seigneurie. La table de marbre l'a ainsi decidé par un jugement en dernier ressort, dâté 2 Aout 1715, rendu en faveur du seigneur de Belleval en Champagne contre les habitants de cette terre; ce jugement a maintenu ce seigneur dans la proprieté et possession d’un chemin qui pour n’a *159 voir pas ete frequenté s’étoit convert de broussailles."
It appears from the same book that frequent discussions took place in France to determine whether the tree, the fruit, &c. growing in the public highways belong to the lord of the manor or the inhabitants.
And these ended in decisions which are reported page 303, in favor of the lord of the manor; (probably because the farms were laid out after the road and were bounded by it,) whatever might have been the reason for deciding the property in favor of the lord of the manor, they clearly shew that the property of the soil was not in the king. Six or seven separate decisions on this point are cited in this book, all equally strong to this point and all relating to public ways.
Let us now approach nearer to the question, and having seen what was the nature of public roads in France, from whence this country was peopled, and by the Roman law, the foundation of that which now governs us; let us enquire whether the French settlers brought with them any particular law on this point, and what change was introduced by the cession to Spain.
The French grants, it is said, reserved a road which was called royal road. Many of them, sub *160 sequent to the year 1757, did so; for the four years prior to that period none of them contained the reservation, and beyond that we have lost the public records, but suppose them all to contain it. The reservation is first, of the timber for the royal navy, and the land necessary for fortifications and royal roads; does this reservation take the things excepted out of the grant, or, does it only allow the king to use them when he shall deem it necessary? I think clearly the latter—the wood, the land for the fortifications and for the road are all contained in the same clause, and therefore must all be tested by the same rule—if then this reserves the property of the things reserved, no individual would be allowed to cut a stick of timber, without infringing on the king’s rights, because all proper for the navy was reserved—he could use no part of his land for fear of trespassing on that which the king reserves for his fortifications: if it be the king’s exclusive property, by virtue of the reservation, he can have no right to use it in any manner; and therefore, until the king locates his fortifications, which perhaps he may never do, and his road, the grantee has no right to possess any part of it and his grant is defeated—whereas by looking to the spirit of the instrument we may adopt a construction that will give both parties *161 the full enjoyment of their respective rights without violating any principle. The reservations are clearly those of three distinct servitudes in the land granted—a right of cutting timber—of using the part necessary for fortifications and of way; on this construction, the grantee has the property of the whole, and may enjoy it in any way not incompatible with the servitudes; and the grantor may, at any interval, claim the use which he has reserved for the different purposes stated in the grant. If this reasoning be correct, let us try it by legal principles; at the moment of the grant, there is no doubt that all the land within the boundaries assigned becomes vested in the grantee, that is to say he has as much right to any one portion of it, as he has to any other. It is not like an undivided portion of the whole, because it has no determinate quantity and it does not grow into existence (particularly in the case of fortification,) until the necessity for it arises; where then, I say, during the interval, is the king’s right, in what part of the premises? In what undivided proportion of them? But can any exclusive ownership in the soil exist, which can neither be located nor described either by a positive quantity or a relative proportion? I think not. Will it be said the estate vests by the mere location and appro *162 priation? This cannot be, if the whole of the tract was before vested in the grantee, because if it were it would require his assent to divest the property he had acquired; if we suppose the reservation to be, as it really is, of a servitude, an incorporeal hereditament, all these difficulties cease, because neither the property nor the possession of the grantee is any bar either to its existence or its exercise. Again, if the exclusive property of the soil vests in the king when the road is once opened or traced, two consequences follow: 1. That he has got all that he reserved,—2. That it must be his until he regrant it.—Now, though the breach of a law is certainly no proof that it does not exist, yet, universal and continued practice has always been admitted, especially in doubtful cases, as an argument to shew what the law is. Even further, when that practice is known to be originally erroneous, yet it acquires respectability from time, and communis error facit jus has been received as a maxim when the error has been slight and of long standing. Now, in this country, both the consequences, that must be drawn from supposing the soil of the road in the public, have been without a single exception violated in practice from the first settlement of the country.—Uniformly, when the soil of the road first located *163 has been washed away, which it frequently is, the proprietor furnishes a new way without compensation, which I have shewn he would not be obliged to do, if the soil were the king’s, but, which he would be obliged to do, if it be as I suppose his own subject to a servitude. Uniformly when the first road has become inconvenient or useless, the proprietor, on opening a new one, appropriates the soil of the first to his own use, which he would not be permitted to do, if the soil belonged to the king, but which he would have a right to do, on the construction for which I contend. The consequences at this day of declaring all the soil that has been at different periods occupied as public roads, by the changes in the bed of the river, it appears to me, are sufficiently serious to be taken into the account.—Hundreds of houses, gardens and other improvements, on this construction, are now placed on land that belongs to the public, and, as they are not bound by any prescription, the occupants are always liable to be disturbed in their most valuable possessions.
Hitherto, we have considered the question as depending on French grants, and governed by French laws; this was done more to meet the general law on the subject laid down in the opinion of the court, than from any necessity in the *164 present case, which arises on an inchoate Spanish grant, confirmed by the United States. None of the Spanish grants (at least none that I have seen) contain the reservation mentioned in the French. They refer to the ordinances that have been made on this subject by the king. The first is dated 15th Oct. 1754. The second by O'Ryley the 18th Feb. 1770. The third by Gayoso the 1st of Jan. 1708, and the last by the Intendant Moralles on the 7th July, 1799. The three first I have not been able to procure, but as our grant, or rather permission must have been under the authority of the last, and this last declares that it is only to enforce the former ones,
there is the less necessity for referring to them. All relating to the subject are found in the following article:
Third Article.
After declaring that those who obtain concessions on the river, shall be held to make a levee the first year, it proceeds thus: “They shall be held moreover to make and preserve in repair the royal road, which must be at least thirty feet in width.” Here certainly are no words of reservation at all, or if there are, they apply equally to the levee which has never been pretended. On the contrary, by shewing that the road is not only required to be made, but to be repaired *165 at private expence, they bring it within the definitions we have quoted of a private road.
In the 5th article, the levee, the road, the canal and bridges are all spoken of, in terms to shew that they equally belonged to the grantee, sa levee, son chemin, ses canaux, ses ponts.
The 5th article expressly acknowledges that the king renounces the possession of the ceded lands, in these terms: Quoique le roi renonce a la possession des terres qui se vendent, distribuent ou concedent en son nom, les acquereurs doivent etre prévenus que sa majesté se réserve le droit de tirer des forets les bois qui pourront convenir pour l’usage de sa marine &c. not a word here of the reservation of any part of the soil, but an acknowledgment that he renounced the possession of the whole, and only retained the right of servitude.
So far then as depends on the terms of the Spanish grant, under which the property is held, there is nothing to ground any argument on a reservation of the soil for the road, in favor of the crown. But on the contrary a duty created of furnishing the land and repairing the road, which duty is only compatible with the idea of a servitude in favor of the public, not of a right of soil.
But this case is stronger, because all the provisions I have stated, apply only to grants on *166 the river, and this is a grant not on any water naturally navigable, which is an important distinctive feature in the case. Our grant also was imperfect before the cession of the country: no conditions were inserted in it and it is confirmed without any, so that the whole cause must rest on these two questions.
Has the legislature of the late territory taken the premises from the plaintiffs?
If they have, had they a constitutional right so to do?
These questions have already been discussed, and I will conclude this argument by some observations solely applicable to this case.
1. If the extention of sixty-two feet, be legally given to the public road, without compensation, the whole of the plaintiff’s property is taken from him, for there is not another foot capable of cultivation on the tract, and he would be therefore not only obliged to give up the only valuable part of his land for a road, but to be at the expence of keeping that road in repair.
2. That as the defendants hired this property from us, they never can, consistent with any rule of law, set up any title adverse to us, they must restore us the possession: then if we encumber the public highway we are answerable on an indictment.
*167 3. That, even if this be a highway, we are the persons who are obliged by law to repair and keep it in order; the residence of the defendant prevents us from performing this duty, therefore we, in our private name, have a right to bring this action, vide Dig. 43, tit. 8, and we have prayed for general relief.
4. That the house in question stands beyond the extent, laid out by the parish jury for the road, and the commissioners were not authorised to give it a greater extent, and if they were, their report has never been confirmed nor even made.
The English cases and those from the different parts of the United States, seem to be rejected by the court as totally inapplicable, but, if the right of the public to the road should have been proved to be a servitude only (as it is respectfully believed has been done) then those cases are extremely important, because they shew, that in a country, in which the police of public roads has been carried to a point of perfection, proverbial among modern nations, no inconvenience has resulted from the soil being considered as private property—that our sister States have suffered the same principle to remain unaltered: and finally, that if the law of the property be the same, the same consequen *168 ces as to the action ought to follow. The case cited from Burrows is one in all its features like the present, and if the law has been established, as I suppose, cannot but be extremely persuasive, although here it wants the force of authority.
REHEARING REFUSED.